Reynolds *vs.* The State.

|   |   |
|---|---|
| 3 | 53 |
| 85 | 361 |
| 85 | 571 |
| 3 | 53 |
| 106 | 358 |
| 3 | 53 |
| 124 | 449 |
| 3 | 53 |
| 129 | 174 |

No. 8.—JOHN REYNOLDS, plaintiff in error, *vs.* THE STATE OF GEORGIA, defendant in error.

[1.] The repeal of the 48th section of the 14th division of the Penal Code of 1833, by the act of 1843, and the change therein made, as to the mode of selecting jurors in criminal cases, does not prevent the trial of an offence committed against the old law ; inasmuch as the 34th section of the 14th division of the Code of 1833, provides, that, "All crimes and offences committed, shall be prosecuted and punished under the laws in force at the time of the commission of such crime or offence, notwithstanding the repeal of such laws, before such trial takes place."

[2.] Before a jury is impaneled in a criminal cause, a *nolle prosequi* may be entered at the pleasure of the prosecuting officer; but when once the accused is put on his trial, and a jury sworn for that purpose, it is the right of the defendant to have them pass upon his case ; and if, after being thus submitted, a *nolle prosequi* shall be entered on the bill of indictment without the consent of the prisoner, it amounts to an acquittal.

Indictment for Murder, and trial and conviction for Voluntary Manslaughter. In Stewart Superior Court. Before Judge ALEX-ANDER. April Term, 1847.

The prisoner had been indicted before for the same offence, and was put upon his trial, and a jury was impaneled and sworn

to pass upon his case, when the solicitor general was permitted by the Court, to enter a *nolle prosequi* upon the bill of indictment, notwithstanding the objections of the prisoner, and the fact that a jury had been impaneled and sworn.

Upon the trial, the aforesaid proceedings under the first indictment were relied upon by the prisoner, as his defence in bar, and as tantamount in law to an acquittal. The Court below ruled out this defence, and held that it was no sufficient bar of the indictment then pending.

The offence charged, was committed before the repeal of the 48th section of the 14th division of the Penal Code of 1833 by the act of 1843, and before the change therein made, as to the mode of selecting jurors in criminal cases. It was therefore contended by the prisoner, that a jury to try him, could not be made under said 48th section of the 14th division of the Code, nor could such selection be made under the new law of 1843, the first being repealed, and the last *ex post facto.*

This objection was also overruled by the Court below. Upon these decisions, error was assigned. For a more minute statement of the facts of the case, see the opinion delivered by the Supreme Court.

JONES, BENNING and JONES, and HINES HOLT, for the prisoner, cited the following authorities : 2 *Caines R.* 100, 304 ; and 1 *John. R.* 66; and authorities cited in argument of counsel and in the decision of the Court; 2 *John. Cases* 301, and cases referred to ; 18 *John. R.* 187 ; 9 *Wheat.* 579; 3 *Rawle,* 498; 6 *Sergt. & R.* 577; 2 *Mass. R.* 172; 9 *id.* 494; 7 *Porter,* 187 ; 7 *Ala. R. n. s.* 610; 1 *Bail. R.* 651; 47 *Eng. C. L. R.* 200; 41 *id.* 351; 20 *Pick. R.* 365; 1 *Dev.* 491; *Kinne Law Comp.* 1844, 363; 34 *Eng. C. L. R.* 36 ; 6 *Bac. Abr.* 372; 1 *Wm. Black.* 451; 1 *Leach C. L.* 271, 481; 2 *id.* 749; 4 *Dallas R.* 372; 9 *Law L.* 39 ; *Starkie on Crim. Pl.* 347, 375, 376.

JOHNSON, and PATTERSON Sol. Gen. S. W. Circuit for the State, representing CAMPBELL, Sol. Gen. of the Chattahoochee Circuit, who was confined by indisposition and unable to attend in Court.

*By the Court.*—LUMPKIN, J. delivering the opinion.

At May Term, 1841, of the Superior Court of Stewart County, John Reynolds was put upon his trial for the murder of Jefferson

J. Lamar, by twelve jurors, selected and sworn true deliverance to make between the State of Georgia and the prisoner at the bar. After the jury was thus charged with the case, the solicitor general, without assigning any cause, and without the consent of the defendant, entered a *nolle prosequi* on the bill of indictment. A new bill was preferred and found, for the same offence, at the October adjourned term of said Court, 1844; and two years thereafter, namely, October, 1846, the accused was again put upon his trial. Counsel for Reynolds objected to the trial's proceeding, on two grounds. *First*—Because they say, the Code of 1833, under which the crime is alleged to have been committed, has been repealed by the act of 1843, as to the qualification and mode of selecting jurors, in capital cases. And, *Secondly*—Because the entry of *nolle prosequi* by the solicitor general upon the former bill of indictment for the same offence, after the case had been submitted to a jury, amounts to an acquittal.

After taking time to consider, Judge Alexander, at April Term, 1847, overruled both objections, and ordered the trial to proceed; and the defendant being convicted of Voluntary Manslaughter, his attorneys excepted to the decision of the Circuit Court in disallowing the foregoing pleas.

The questions presented by the record for the determination of this Court, are of a highly interesting character, and of vital importance to the criminal jurisprudence of the State.

We feel deeply impressed with a sense of our responsibility, both to the prisoner and the people.

In the examination of the two grounds made by the bill [ 1. ] of exceptions, I shall invert their order and dispose of the last first.

The 48th section of the 14th division of the Penal Code of 1833, *Prince*, 664, 665; (and which was in force at the date of the offence alleged to have been committed by Reynolds,) provides that on all trials for crimes, where the punishment is death or imprisonment and labour in the Penitentiary, any juror may be put upon his *voire dire*, and the following questions shall be propounded to him, viz: "Have you formed and expressed any opinion in regard to the guilt or innocence of the prisoner at the bar?" If the juror shall answer in the negative, then the following question shall be propounded to him: "Have you any bias or prejudice resting on your mind, either for or against the prisoner at the bar?"

By the Act of 1843, *Pamphlet Laws*, 137, this section is expressly repealed, and the following questions substituted in lieu of those therein propounded, viz : " Have you, from having seen the crime committed, or having heard any part of the evidence delivered on oath, formed and expressed any opinion in regard to the guilt or innocence of the prisoner at the bar ? " " Have you any bias ·or prejudice resting on your mind for or against the prisoner at the bar ? " ·

As to the first point, we recognise fully the position occupied by the defendant's counsel, to wit ; that an offence against a statute, committed before the repeal, cannot be prosecuted after the repeal, *without a special clause to allow it.* This doctrine and the reasons for it are to be found in all the elementary works. It cannot be tried under the old law, for courts can only act by authority of law, and the State, whose right it is to release crimes and forfeitures against itself, having seen fit to repeal the statute, has thereby taken from the courts all power to proceed. And it cannot, of course, be tried under the new, as it would be *ex post facto* as. to it. If this matter therefore depended upon general principles, it would be clear for the defendant.

But the 34th section of the Penal Code, (*Prince*, 662,) enacts that, " all crimes and offences committed shall be prosecuted and punished under the laws in force at the time of the commission of such crime or offence, notwithstanding the repeal of such laws before such trial takes place."

Now here is a general statute, making special provision for this case, and which is untouched by the act of 1843. This latter act virtually adopts the other, and the legal effect is the same as though the statute of 1843 contained a clause in itself, allowing for the prosecution of this previous offence, under the law against which it was committed.

[2.] It would be gratifying indeed if the other question was equally easy of solution. Be this as it may, the fate of this unhappy man· and the welfare of society alike forbid, that this Court should falter for a moment, or shrink from its duty. We often painfully feel the disagreeableness of our situation ; for we are men, and cannot of course be believed voluntarily to court calumny.· But, in the language of the greatest jurist that ever presided in the courts of this or any ·other country, " If we have no choice in the case, if there be no alternative presented, but a dereliction of duty, or the opprobrium of those who are denomi-

Reynolds *vs.* The State.

nated the world, he merits the contempt as well as the indignation of his country, who can hesitate which to embrace."

The great principle upon which this second objection rests, is that laid down by Lord Coke in his Institutes, namely: "A jury sworn and charged in case of life or member, cannot be discharged by the court · or any other." 1 *Institute*, 227. And again— " To speak it here once for all, if any person be indicted of treason, or of felony, or larceny, and *thereupon a jury is returned and sworn,* their verdict must be heard and they cannot be discharged. 3 *Institute*, 110. The same rule is repeated by Hawkins. He observes, " It seems to have been anciently an uncontroverted rule, and hath been allowed even by those of a contrary opinion to have been the general tradition of the law, that a jury once sworn and charged in a capital case, cannot be discharged (without the prisoner's consent) till they have given a verdict. And notwithstanding some authorities to the contrary in the reign of King Charles II., this hath been holden for clear law, both in the reign of King James II. and since the revolution." 2 *Hawk. P. C. ch.* 47, *sec.* 1.

The cases here referred to as having occurred in the reign of Charles the Second, were those of Whitehead & Fenwick, where the juries were discharged because there was not sufficient evidence to convict, and in order to bring the prisoners to a second trial when the Crown would be better prepared—a practice which Mr. Justice Foster condemns as a " most unjustifiable proceeding," and hopes that it may never be practised again. *Foster Crown Cases*, 30. And Judge Hall, of North Carolina, in referring to these cases, animadverts, with becoming severity, upon the great hardship and manifest injustice of this practice, to the prisoners. " These stains," says he, " upon the administration of justice, show to what extremes, in a state of civil discord the passions of men urge them to trample upon the most salutary principles of law ; and in what degrees judges, holding their office at the will of the sovereign, were eager to pander to his appetite for blood and forfeitures" ! 1 *Dev.* 499.

It is true, that Lord Hale claims for the court, not only the power to discharge the jury where the prosecutor was not fully prepared with evidence, but says that it was usual at the gaol delivery at Newgate, that if a jury be charged with several prisoners, and the court find by probable circumstances that the jury is partial to one of the prisoners, the court may discharge the jury of

that prisoner, and put him on his trial by another jury : and this practice he says was usual in other circuits. " A lamentable instance," exclaims Judge Duncan, " of the abuse of discretion, and a strong proof of the danger of entrusting this power to judges when the great and good Lord Hale fell so far into the fashion of bad times, as to countenance by his authority a practice so inconsistent with justice and humanity ; undermining the very foundation of trial by jury, the pride and boast of the English nation, the palladium of English liberty, and the only security and protection of the subject against the oppression of the government."— 6 *Sergt. & Rawl.* 594.

When, therefore, the name of Lord Hale shall be invoked to impugn this fundamental principle of criminal law, let it be borne in mind that it was during the reign of Charles the Second that he composed the History of the Pleas of the Crown ; and that it was *then* that the rule of Lord Coke—that in a capital case a jury sworn and charged, could not be discharged but by the consent of the prisoner—was first broken in upon.

I am aware that Sir Michael Foster in the case of the Kinlocks, and other eminent Judges, have striven to show that the case cited by Lord Coke from the Year Book of Edward III., did not sustain him. But a majority of the ten judges, in that case admitted the authority of the general rule, but contended that there were exceptions—as there certainly are. But its soundness is universally acknowledged, and has been for centuries, in Britain.

The question in the case of the Kinlocks (Alexander and Charles,) was, whether a prisoner could consent to a discharge of a jury, even when he was thereby let in to claim an advantage which he might otherwise have lost. And *Foster* concludes his opinion by saying, " This expedient the court came into at the prayer of the prisoners and their counsel, and with consent of the Attorney General, *not to bring the prisoners' lives twice* in *jeopardy,* (which is one great inconvenience of discharging juries in capital cases,) *but merely in order to give them one chance for their lives, which it was apprehended they had lost by pleading to the issue. Nor was it done to postpone their trial to an unreasonable distance, when their witnesses might be dead or wearied out by a long and expensive attendance,* but in order to bring them to trial with all speed that might be, in case their plea should be overruled. Upon the whole my opinion is, that all general rules touching the administration of justice must be so understood as to be made consis-

tent with the fundamental principles of justice; and consequently all cases where a strict adherence to the rule would clash with those fundamental principles, are to be considered as so many exceptions to it.    The cases I have mentioned, and many others, are exceptions to the general rule insisted on in behalf of the prisoners. The discharge of the jury in this case was not a strain in favour of prerogative; it was not done to the prejudice of the prisoners; *on the contrary it was intended as a favour to them.    In that light it was considered by the court; in that light it was considered by the prisoners and their counsel, and accordingly they prayed it; and in that light Mr. Attorney General with his usual candour consented to it; and in that light I know of no objection in law or reason to it."*

I have thought it best to show thus clearly, the grounds upon which this distinguished and humane magistrate put his dissent to the rule as stated by *Coke & Hawkins,* namely: that it was laid down so broadly as to admit of no exceptions.    Whereas Judge Foster insists that there were exceptions, and the case before him was one of them.    But then it will be perceived how explicit he is, to put his departure from the rule upon the ground of *benefit to the prisoners.*

The only other ancient authority of respectability against the rule is that of St. Germain in his Dialogues of Doctor and Student, 2 *ch.* 2 *sect.*, where it is said that "if the jury will not agree, the justices may take such order as may seem to them, in their discretion, to stand with reason and conscience, by awarding a new inquest or otherwise as they shall think best, like as they may do if one of the jurors die before verdict."

It is not certain that this remark was intended to apply to criminal cases.    On the contrary there is good reason for supposing that it had reference exclusively to civil cases    .At any rate, when this work was composed, the rights of prisoners and the privileges of jurors were very imperfectly understood.

Such then was the common law on the 14th day of May, 1776, when it was adopted in this State; and it underwent no alteration until the Penal Code of 1833 was framed.

Our legislature then manifested in a most decided manner its concern for the security of its citizens.    Various and contradictory decisions had been made in the American Courts, as well as in the different circuits of Georgia.    In some the rule was inflexibly adhered to, that after the jury were once sworn and charged, no other jury could, in any event, be sworn and charged in the

same cause; while in others, the discharge of a jury in a criminal case, was looked upon as a matter resting in the sound discretion of the court in which the trial was had.

The Code of 1833 declares, that "no *nolle prosequi* shall be entered on any bill of indictment after the case has been submitted to the jury, except by the consent of the defendant," *Prince* 661. It is not believed by this Court that this provision creates any new rule. "Its object," to borrow the language of Mr. Emmet in respect of a kindred clause in the Constitution of the United States, "is merely to settle the extent of, and to explain a rule admitted to be founded on the common law, but the limits of which had been disputed. *It is a most authoritative interpretation of that rule.*"

After reviewing a few leading cases where no such legislative enactment exists, but where the rule is clearly defined and enforced, by a course of reasoning to my mind entirely conclusive, it will only remain to make an application of them to the case before us.

In the matter of Robert Spier, 1 *Dev.* 491; the jury were charged with the trial of the prisoner for murder, and before they returned their verdict, the term of the court expired, and the jury separated. He was brought up on *habeas corpus* before Chief Justice Taylor and Judges Hall and Henderson, and claimed his discharge upon the ground that he could not be tried again, and it was held, after the most elaborate argument, that when a jury is charged with the trial of a capital offence, they cannot be discharged without returning a verdict, unless for some cause which human sagacity can neither foresee nor prevent. That the provision of the constitution that "No person shall be subject for the same offence to be twice put in jeopardy of life or limb," not only forbids a second trial for the same offence, after an acquittal, but also where the jury have been once charged upon a perfect indictment and were not prevented from returning a verdict by the act of God, or at the request of the prisoner.

Judge Hall remarked that "the guilt or innocence of the prisoner was as little the subject of inquiry as the merits of any case could be, when brought before the court on a question of law. Although the prisoner, if unfortunately guilty, may escape punishment in consequence of the decision this day made in his favour, *yet it should be remembered that the same decision may be a bulwark of safety to those who were innocent, and may become the subjects of*

Reynolds *vs.* The State.

*prosecution, and whose conviction if not procured on one trial might be secured on a second or third, whether they were guilty or not."*

"From the record in this case it appears, that a jury were *impaneled and sworn, but no reason is assigned why a verdict was not returned.* It is true that, like other individuals, we are privately informed that the term of the court expired before the jury had an opportunity of doing so. But it must be preposterous to suppose that this Court could be governed by any thing else but the record. Here then was a jury selected of the prisoner's own choosing, and one too to which the State did not object: *when the jury were thus charged with the prisoner, he certainly stood upon his trial—his life was jeopardized.* From this maxim there are some exceptions, but such exceptions are the offspring of necessity, as where a juror is taken suddenly sick, where a woman is taken in labour, where the prisoner becomes insane, or where the jury are discharged by the consent of the prisoner or at his request."

"But this is not the first time this question has arisen in this State. It was decided in the *State* vs. *Garrigues*, 1 *Hay.* 241, for murder, in the Superior Court of Halifax, in the year 1795. There the presiding Judge retired from the bench, but did not adjourn the court, and the jury having been impaneled in the case, separated without giving a verdict. It was held by *Williams & Haywood,* that the prisoner could not be put upon his trial a second time. The record there and the record in this case, are alike. *In both cases we learn, that the jury were impaneled but returned no verdict before the expiration of the term* I may add, that that opinion drew after it the approbation of the profession, and I believe I shall not treat with disrespect the memory of the dead or the pretensions of the living, when I say that a greater criminal lawyer than Judge Haywood, never sat upon the bench of North Carolina."

"It is stated in Hale, that the practice was once otherwise; that where the prisoner was put upon his trial, the court might discharge the jury, if it appeared that the evidence was not sufficient to convict him, and remit him to jail for further evidence. *It is stated, however, in a note in the same book, that the practice is now otherwise;* and Judge Haywood says, in the *State* vs. *Garrigues*, "this power was exercised for the benefit of the Crown only, *but is a doctrine so abhorrent to every principle of safety and security, that it ought not to receive the least countenance* in the courts of this country."

" I admit that, if the jury has been charged upon an indict-
ment which was in itself defective, so that judgment could not be
given upon it, although the prisoner was found guilty, it would
be no bar to a second trial; because, although such feelings
of danger might have been awakened as are incident to human
nature, and which such occasions are naturally calculated to
excite, yet, in reality, the prisoner ran no risk, he was in no
danger, he was tried as if upon no indictment.    But in this
case, if the prisoner had been found guilty, he must have
suffered the penalty of the law.   He was placed upon his trial,
his life was in the hands of the jury, his breast was occupied by a
commixture of hope and fear; it throbbed alternately with both,
and whether the struggle terminated in a verdict of guilt or inno-
cence, it was certainly a guarantee against any future prosecution
upon the same charge ; and that guarantee need not claim to be
bottomed upon any extraordinary maxim marked with tenderness
for the life of man.   It is a plain principle of municipal jurispru-
dence, regulating ordinary cases of property between man and
man."

Chief Justice Taylor, after alluding to the exceptions which
had been allowed to the rule laid down by Lord Coke, Foster
and others, who are the fathers of the English law, and other
exceptions which he thought might be fairly added without
mischief either to the prisoners or the public, proceeds to com-
ment upon some of the adjudications in this country which
seemed to conflict with his opinion.   None of them were *capital
felonies*.   He admits, however, that the case of Goodwin,
(18 *John* 200,) if rightly decided, was an authority against the
prisoner; for, although the offence charged was not a capital
felony, yet the reasoning of the court extends the whole length
of showing, that the jury may be discharged in any case and the
prisoner tried again.   The distinguished judge, who delivered
the opinion of the court in that case, thought the rule, which de-
clares that no person shall be subject for the same offence, to be
twice put in jeopardy of life or limb—means, that no person
shall be *twice tried* for the *same offence*.   " But I cannot," says the
Chief Justice, " acquiesce in this opinion ; for it would seem
strange, that a familiar maxim of the common law, admitted for
ages without denial or controversy, should require a solemn con-
stitutional sanction for the more effectual protection of its citizens.
The pleas of " heretofore convicted," and " heretofore acquitted,"

are interwoven with our criminal law, as essentially as the pleas of former judgments between the same parties, or the pendency of another suit for the same cause are with our civil law. Could then the amendment to the Constitution of the United States mean no more than this, when it provided that, " no person shall be subject for the same offence, to be twice put in jeopardy of life or limb ?" Did the Constitutions of the several States mean no more when they adopted the same principle ? As the common law of any State already protects the accused against a second trial, not only in crimes of all descriptions, but in questions of civil right, it is to be inferred that the Constitution meant much more, and that their design was to protect the accused against a trial, where the first jury had been discharged, *without due cause.* " Twice put in jeopardy," and " twice put on trial," convey to the mind distinct meanings; for we can readily understand how a person has been in jeopardy, upon whose case the jury has not passed. The danger and peril of a verdict do not relate to a verdict given. When the jury are *impaneled* upon the trial of a person charged with a capital offence, and the indictment is not defective, his life is in peril, or jeopardy, and continues so throughout the trial; and this is the legal understanding of the term as explained by Chitty in his Criminal Law, (1 vol. 63,) and all other authors."

" Under this impression, I do not feel the authority of law (and we are bound to yield obedience to authority of law, without regard to consequences,) to add this new exception to the rule, subject as it is in its very nature to operate oppressively to the prisoner without any exterior agency or the influence of sinister design ; but it would be still more capable if such were present, of being made an engine of persecution. Not that there is reason to apprehend any such influence in the present tranquil state of the country, and under the existing purity of the administration of justice. But a rule established in such times, should be calculated to protect men when strife prevails and the angry passions are let loose ; for it cannot be foreseen what may ensue in future; and the law as now established must be the rule for posterity, unless the legislature should think proper to interfere. Should the rule, according to this opinion, facilitate the escape of some guilty person, the contrary, in other times, might lead to the punishment of the innocent; and we are admonished by the law, that it is better that ten guilty persons escape, than that one

innocent should suffer. My opinion consequently is, that the prisoner cannot be tried again on this charge."

It is, I would remark, but just to Chief Justice Spencer, to notice that, while he held that the courts had the power of discharging a jury, without its operating as an acquittal of the defendant, yet he added that it was " a delicate and highly important trust, and one that should be resorted to only *in cases of extreme and absolute necessity.*"

In Pennsylvania, in the case of the *Commonwealth* vs. *Cook and others*, 6 *Serg. & Rawl.* 577, the whole of this doctrine was thoroughly examined, and all the cases, ancient and modern, English and American, reviewed; and the conclusion of the court was, that in capital cases, the court has no power, without the consent of the prisoner, to discharge the jury because they have not agreed and declare they never can agree upon a verdict. They admit, that in cases of absolute necessity, the jury may be discharged.

It will be found that not one of the State decisions which seem to contravene the rule contended for, was in a *capital case*. And Chief Justice Tilghman says that, in his State, there is neither adjudged case nor tradition, to warrant the discharge of a jury, and that he is safe in asserting, that there is no instance, since William Penn obtained his charter from Charles II., in which the jury was discharged without the consent of the prisoner, in a capital case ; and that the general understanding is against it. He adds, " in the state of purity and independence in which I verily believe the judiciary of the several States, as well as of the United States, at present stands, there might be no danger of opression from its enjoyment of a very large discretionary power, as to the discharge of duties; but other times may come in which other judges might abuse this discretion, and that it is fortunate that the point has occurred, when the subject may be considered without prejudice or passion. " For my own part," says he, "thinking that the blood of these prisoners would be upon us if they were convicted on a *second trial* in this court, I am of opinion they should be discharged from this indictment."

Judge Duncan in the same case says—" There is at this day a settled and uncontroverted rule, that in case of life or limb, a jury sworn and charged, cannot be discharged before they give a verdict unless with the consent of the prisoner, or where it is for his benefit, or in cases of extreme necessity." He too reviews the

decisions up to 1822 upon this doctrine, and finds no contradictory case; he criticises Goodwin's case, which he admits approaches very near to the present question. The crime charged was *manslaughter* only, and the fact that the hour approached beyond which the court could not sit, was a circumstance of itself which might have justified the discharge of the jury. He insists however, as Chief Justice Taylor did afterwards, that the New York Court, with all its acknowledged ability, had not given the true construction to the provision of the constitution, that no person should be twice put in jeopardy of life or limb for the same offence—a principle engrafted into the constitutions, or made an article in the bill of rights, of most of the States of the Union. Being borrowed from the common law, he contends that the same construction ought to be given to it which it has received in the courts of the common law. "That it would be idle and unmeaning, if it merely intended to protect the accused against a *second trial;* for it is a universal principle, not only in every crime, whatever be its grade, but in personal actions, and in all questions of civil right, that a verdict and judgment is a bar to all subsequent proceedings for the same cause, between the same parties or privies. To make that which was so plain and universal a rule, a solemn article in a constitution; to introduce it into a bill of rights, declaring that to be one of the great and essential principles of liberty and free government, unalterably established, which was the acknowledged law, in every, the most insignificant offence, would not only be without use or meaning, but would be to impute to the framers of the constitution, an ignorance of the law which cannot justly be ascribed to them. That this is not the signification of the words used in their common use, nor in their grammatical or legal sense; twice put in jeopardy, and twice put on trial, convey to the plainest understanding very different ideas; that there is a wide difference between a verdict given and the jeopardy of a verdict. Hazard, peril, danger, jeopardy of a verdict, cannot mean a verdict given. Whenever the jury are charged with a prisoner, where the offence is punishable by death, and the indictment is not defective, he is in jeopardy of his life."

"In England, the courts have no authority to discharge a jury on whom a prisoner has been put on trial for life or death. In Pennsylvania, from its first settlement, it has neither been claimed nor exercised. Before the jury is sworn the prisoner is solemnly called,

and informed that the good men then called, are to pass upon him for his life or death; and the jury are sworn or affirm, well and truly to try and true deliverance make, between the Commonwealth and the prisoner whom they have in charge. For my own part I would regret to see the court vested with a power which has so often been abused and so liable to abuse. In the language of the constitution I would desire that, "the trial by jury shall be as heretofore, and the right thereof remain inviolate."

Did time permit I would extend this examination, as there are numerous other adjudications upon the same point, and some of a much more recent date. But we state it as the result of the best consideration we have been able to bestow upon them, that any *unauthorized* discharge of a jury in a capital case, is a complete bar to another trial; just as much so as though there had been a verdict of acquittal.

What shall justify the court in discharging a jury, *is* a matter about which there is some contrariety of opinion. But after the most thorough search, I have found no case where the first jury were *capriciously* discharged, or where as in the present instance, the record showed no reason for their discharge, and the prisoner has been allowed to be tried a second time; and I apprehend none such can be found. Even those who contend for the un-limited power of the court over the subject, concede, that it is to be exercised " with extreme caution;" that it is only to be done when there is a manifest necessity for the act, or where the ends of public justice would otherwise be defeated. And although the Court of New York claimed the right in Goodwin's case, one is struck with the very guarded manner in which it expresses itself. "Upon the whole," says Spencer, "I am of opinion that whenever, in cases of felony, a jury has deliberated so long upon a prisoner's case as to preclude all reasonable expectation that they will agree on a verdict, without being compelled to do so from famine or exhaustion, *then it becomes a case of necessity,* and they may be discharged, and the prisoner may be tried again.— In the present case, we consider the discharge of the jury as a discreet exercise of the powers of the court, either on the ground that the jury had been kept together so long as to preclude all hope of their agreeing, unless compelled by famine or exhaus-tion, or upon the ground that the powers of the court were to terminate in a few minutes, and that it was morally certain that

the jury could not agree within that period, *which produced an absolute necessity for discharging them."*

Thus it will be perceived, that this very case is put upon the same footing of *necessity*, as that of the insanity of the prisoner, or the sickness of a juror, and such like reasons. And who can doubt what would have been the opinion of this great judge upon the question before us, where no excuse whatever is shown by the record, why the twelve men, mutually chosen by the State and the prisoner, and sworn, were discharged? The Supreme Court of that State determined, that a court did not possess the authority to discharge a jury for want of sufficient evidence to convict, although such evidence was shown to exist and *to be in the possession of the defendants;* and the judgment was arrested because the first jury had been irregularly discharged. *People* vs. *Barrett & Ward*, 2 *Caines* 305. Of course therefore, it would not hesitate where the record did not furnish proof that a case of necessity did actually exist, requiring the discharge of a jury.

In the absence of such evidence, we are bound to infer that the discharge was *capricious,* and that the prisoner could not be put in jeopardy a second time. And such would be our judgment, independently of our own statute; and such we doubt not would be the decision of any court where trial by jury and the common law are adopted.

But this point can be narrowed down still further. In Massachusetts, *Commonwealth* vs. *Tuck*, the attorney general proposed entering a *nolle prosequi* upon an indictment then pending and to the prejudice of the prisoner. But the court would not suffer this to be done. " There are three periods of the prosecution," says Justice Martin, " in which a *nolle prosequi* may be entered; *before a jury is impaneled,* while the case is before the jury, and after verdict. In the first it is perfectly clear, that a *nolle prosequi* may be entered at the pleasure of the prosecuting officer—such is the constant practice. It may be that the indictment is defective and he may wish to procure another. He may discover that the evidence will turn out different from what he expected, and he may wish to vary the charge to make it conform to the proof. Or he may have good reasons for not wishing to prosecute at all. There may be innumerable causes for discontinuing the prosecution, of all of which he must judge upon his official responsibility. In many cases the discontinuance may operate to the prejudice of the defendant, but never to the injury

of his legal rights. It is not to be presumed that this officer will violate his duty, or act oppressively. But when a jury is impaneled for the trial of an indictment, the defendant then acquires new rights which the court will protect, whether a jury shall be impaneled or not, for his trial depends upon the will of the attorney general. *But when once put on his trial, and a jury sworn for that purpose, it is his right to have them pass upon his case. Their verdict will be a bar to another indictment for the same offence. A nolle prosequi will not. He is entitled to this bar.* The attorney general finding his evidence insufficient," or I will add, *not liking the complexion of the jury,* "might discontinue, for the purpose of commencing another prosecution, and then subjecting the defendant to another trial. *This the law will not permit. In this stage of the proceedings a nolle prosequi cannot be entered without the consent of the defendant.* 2 *Burr's trial.* The power to enter a *nolle prosequi* is held by the attorney general *virtute officii.* He exerts it upon his official responsibility. The Court has no right to interfere with its exercise. They can only judge of the effect of the act when done, and of the legal consequences which may follow from it. *They will take care that it shall not operate to the prejudice of the defendant's rights,*" 20 *Pick*. 365.

The court then proceed to notice the *third period* when a *nolle prosequi* may be entered, namely: *after verdict,* which has no application to the case in hand.

In the State *vs.* McKee, 1 *Bailey* 651; the defendant was indicted for the murder of a slave; was arraigned, pleaded not guilty, made his challenges, and *the jury were charged with his deliverance.* The evidence on both sides had been concluded, and the counsel for the prisoner had closed their argument for the defence, when the solicitor stated to the court, that he had been informed of a declaration by the foreman, made only a few minutes previously, that he would not convict the defendant, or any other white person, of murdering a slave. On inquiry, the foreman admitted that he had made the declaration: whereupon the solicitor stated that it would be a mockery of justice to proceed with the trial, and he should enter a *nolle prosequi* with a view of giving out another indictment at the next term. It was objected for the defendant, that a *nolle prosequi* could not be entered at this stage of the proceedings; particularly as it was not founded upon any alleged defect in the indictment, which was believed to be unexceptionable. The presiding Judge was of the opinion that the

solicitor might dispose of the indictment as he pleased; *but that the rights of the prisoner could not be affected by the disposition made of the indictment.* A *nolle prosequi* was then entered; upon which the jury were discharged and the prisoner remanded. On the last day of the term he was brought up on motion, and claimed his discharge upon the ground that the entry of *nolle prosequi* after the prisoner had been put upon his trial, and the jury charged with his deliverance, upon an indictment for a capital offence, amounts to an acquittal. The presiding judge inclined to the opinion that the prisoner was entitled to his discharge; but as it was desirable that the case should be submitted to the Court of Appeals, and less difficulty would attend its being carried up by the prisoner, than by the State, he refused the motion. The defendant appealed, and the appeal was by consent taken to Columbia, where the court decided "that after the jury have been charged with the trial of the prisoner upon an indictment in a capital offence, they cannot be discharged and the prisoner remanded for a second trial, except for some of those causes of necessity enumerated in the case. That the discretion which the courts have, to discharge a jury and remand the prisoner, is a *legal discretion,* and must be exercised in conformity to known rules.— That the prosecuting officer cannot enter a *nolle prosequi* in a case of an indictment in a capital offence, without the consent of the prisoner; and if he is permitted to do so, the effect is the acquittal of the prisoner. And this upon the principle that no man could be twice put in jeopardy of his life for the same offence.

Judge O'Neall, who delivered the opinion of the court, after making a rapid survey of the cases decided in his own State, and elsewhere, says—" Taking then our own decisions, and those of the United States Courts, of New York, and of England together, we are enabled to say, that a jury, after they are charged, can be discharged, and the prisoner tried a second time, for the following causes only: 1st. The consent of the prisoner; 2d. Illness of one of the jury, the prisoner or the court; 3d. Absence of one of the jurymen; or 4th. The impossibility of their agreeing on a verdict. Beyond these I apprehend that the court has no right to go. It is said that it is a matter of discretion with the court to discharge the jury whenever they may think it consistent with the ends of justice. It is true that it is a matter of discretion; but, in the language of Junius, it is " a legal discretion," and must be exercised in conformity to known rules. Arbitrary discretion is but another name

for caprice or favour; under its exercise the boldest may tremble and the free be made slaves. It is better therefore to act upon a fixed rule, even if it should now and then enable the guilty to escape, than to act without a rule, to the terror and danger of the innocent."

" The solicitor has the right to enter a *nolle prosequi*, at any time before the jury is charged, but not after. Chitty, in his Criminal Law, 478, says, a *nolle prosequi* may be entered during all the stages of pleading to the indictment. As to the power of entering it after the issue, he is silent, and I take it therefore that, in his opinion, it could not be done. But Gulden's case, (2 *McC.* 524,) as well as sound reason, will carry this power up to the time *when the jury are charged;* for at this moment, and not before, commences the jeopardy of life to the prisoner. The maxim of the common law, that no man shall twice be put in jeopardy for his life for the same offence, is the foundation of the rule, which prevents the arrest of the trial after this stage, except for the causes already noticed."

" But say that this question was a new one, and that it must be settled by general principles, could we fail to come to the same conclusion ? Starting with the common law maxim before us, " no man shall be twice put in jeopardy of his life for the same offence," we ask, what is meant by jeopardy of his life ? *It is where one is put upon his trial upon a valid indictment for a capital offence.* It may result in his condemnation, and hence he is in jeopardy. To give every opportunity to innocence to escape, the law humanely affords to the prisoner the arbitrary choice of his jurors; he may challenge twenty of them peremptorily. After he has selected his jury, and they are charged with his case, can the solicitor, from a defect of evidence, or an objection to a juryman, say, I will not now proceed with the trial, I will enter a *nolle prosequi,* and at another term give out a second indictment, and be prepared then with more evidence, and *have a jury better suited to my wishes ?* This would indeed be literally twice putting the prisoner's life in jeopardy for the same offence. Carry the matter a little further, and, as was well argued by the learned counsel for the prisoner, allow this right to the solicitor, and the prosecutor is prepared, by the second trial, to meet all the points of the prisoner's defence, and even to shape his own testimony to conviction. This would be making the court hold out every inducement to perjury, and subornation of perjury, and convert jury trials into engines to

oppress and destroy at the pleasure of the prosecutor. Such is not, cannot, and never will be the law."

" It is said, however, that in this case, the solicitor having discovered the bias of the foreman's mind, had the right to arrest the trial, and to claim that the court should discharge the jury and remand the prisoner. The solicitor acted from motives which do honour to him, and no man who knows him will believe that his course was adopted from any other promptings, than those of a high sense of duty to the State. But no matter how laudable may have been his motives, I apprehend it would be utterly unsafe, at such a moment, to allow such an objection to prevail. This court has over and over again said, that in no case in the sessions will they grant a new trial, when the verdict is for the defendant. It is the extension of the principle, that no man shall be twice put in jeopardy of his life, so far that no man shall twice be tried for the same offence, when one jury has passed upon and declared his innocence. It is giving to the prisoner, the benefit not only of the prejudices of his jurors, but even of the errors of the judge; where would be this protection if the solicitor could say, *I find the jury are with you* and therefore will enter a *nolle prosequi* and give out and try you on a second indictment ? It would be, in effect, allowing to the solicitor a power which this court denies that itself possesses, of subjecting the prisoner to a new trial as often as it might be necessary to obtain a verdict of guilty."

" But suppose the prisoner had been tried and found guilty, and was moving for a new trial on the ground that one of the jury believed that, 'he who sheddeth man's blood by man shall his blood be shed,' and that this belief caused his conviction, the ground would avail him nothing. He would be answered, you had your twenty challenges, and if you had cause, you might, on cause shown, have challenged every man on the panel. You should have objected as they came to the book to be sworn, and before they were sworn; your objection, if of any value, is now too late. Ought the State to be more favoured than the prisoner ? Certainly not. If the prisoner had the prejudice of a single juryman in his favour, and the State permitted him to be sworn, and the jury were charged with the case, it was the protection perhaps of error, but certainly a legal protection. The prisoner's life was in jeopardy, and objections to the jury, or any of them, could no longer be made.

" The solicitor having entered a *nolle prosequi* after the jury

were charged, and they being discharged without any lawful cause upon which the prisoner's case can be remanded for trial a second time, it follows that he is acquitted."

" The motion for discharge is therefore granted, and the prisoner forever acquitted of the said offence."

If then these courts have rightly apprehended the law, and they are abundantly fortified and sustained in their opinions, it is clear that Reynolds, the defendant, must be discharged upon general principles, and without the aid of our own statute, and that too were he even ten times more guilty than he is   And, instead of laying down rules for the guidance of courts, I have preferred, on this occasion, to rely upon the authority of those sages of the law, Haywood and Hall, Tilghman, Taylor and O'Neall, who, living or dead, will command attention and confidence.   It will not be suspected or insinuated, that these men were either mad or actuated by any sickly sentimentality for human suffering.   As faithful and vigilant sentinels set to guard the citadel of civil liberty, they have esteemed it their duty to sound the alarm whenever the outposts of this noble fabric were assailed; and if they have expressed themselves warmly, it was not from temper, much less from any more ignoble passion, but because they felt deeply.   Their bosoms kindled with zeal in the same cause which animated their Saxon ancestors.   They are but consummating the work, giving the finishing blow to the struggle for human rights, commenced more 'than six centuries ago, by the sturdy old barons at Runnymede. And the issue cannot be doubtful nor much longer delayed, between *privilege* and *power*, the people and their rulers.   And when the victory is fully won, then it will be seen and acknowledged, that *Magna Charta, the Petition of Right, the Habeas Corpus, the Bill of Rights,* and *Act of Settlement,* are the original foundation, basis and embodiment of the liberty of the world.

And it is an error to suppose that these old statutes are now dead and forgotten.   Such was not the estimate put upon these glorious monuments of the rights of man, by the Sullivans, the Adamses, the Duanes, the Jays, the Livingstons, the Randolphs, the Henrys, the Harrisons, the Pendletons, the Washingtons, the Gadsdens, the Middletons, and Rutledges, of 1774.   These immortal men who sat in the first congress of that year revered those *charters* as the true and only source of those great principles in which all true governments are founded.   Their session continued from the 5th of September, 1774, to the 26th day of

October; and to the Journal published by their order and verified by the autograph of their secretary, is prefixed in the title page, a medallion, having for its pedestal the *Magna Charta* of England, on which is raised the column and cap of liberty, supported by the twelve colonies assembled by their delegates, declaring that *hac nitimur, hanc tuemur,* " *on this we rely,*" " *this we will defend.*"

Thirteen years afterwards, in 1787, six of these men were in the convention which framed the constitution. They exerted an unbounded influence in all the new States of the Union, and it is not strange therefore, that the common law should have been made the model of our Federal Compact—the pattern of all our early institutions. It was for the protection of the human rights guarantied by the common law and these old statutes of England, and for their violation, that the war of the Revolution was undertaken, as the Declaration of Independence shows; and by the ordinance of 1787 they were declared to be the basis of all laws, constitutions and governments, which forever thereafter shall be framed in the territory north-west of the Ohio. 1 *Laws U. S.* 479.

It is not then unbecoming the gravity of those who minister at the altar in the Temples of Justice, appreciating as they do the blessings bequeathed to us by our venerated ancestors, to exhibit more than ordinary earnestness whenever the essential doctrines of the common law are threatened. What a vast expenditure of blood and treasure did it cost to secure to us and to posterity, religious toleration; freedom of speech and of the press; the right of petition; to keep and bear arms; to be exempt in our persons, houses, papers and effects from unreasonable searches and seizures; from being twice put in jeopardy of life or limb for the same offence; from being deprived of life, liberty or property, without due course of law; from having our private property taken even for public use, without just compensation; the enjoyment of the right to a speedy and public trial, by an impartial jury of our neighbours; to be informed of the nature of the accusations, to be confronted with witnesses, to have compulsory process for obtaining our testimony, and to have the assistance of counsel for our defence. Would that court discharge its obligations faithfully or satisfactorily, which would submit to see these invaluable privileges violated or infringed ? or even to repel with cold indifference any attempt to undermine them ?—

Far be it from us to intimate that the Court below intended to oppress the prisoner. That Judge is above reproach. His reputation for probity and patriotism, is cheerfully accorded by the whole State ; and sitting as an appellate judge, he would be the first to repudiate his own decision if convinced of its error. Constituted as our courts are, the wonder is, in every generous mind, not that so many, but that so few of the many thousand adjudications made by the circuit judges, should be complained of. The general acquiescence and contentment of clients and counsel, reflect the highest credit and compliment on that bench.

The first jury then, in 1841, in the language of the common law having been charged with this cause, or it being submitted to the jury in terms of our Code, and a *nolle prosequi* having been entered by the solicitor on the bill of indictment, without the consent of the defendant, and the record disclosing no *necessity* for this discharge, we are unanimously of the opinion, that the defendant could not be put on his trial a second time for the same offence. And that in all such cases, discharge and acquittal are synonymous terms.

Judgment reversed.